IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

CARL BUSH o/b/o SUSAN BUSH,       )
                                  )
              Plaintiff,          )
                                  )
        v.                        )     Case No.
                                  )     12-1061-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting         )
Commissioner of Social Security,  )
                                  )
              Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Carl Bush, substituted as plaintiff in this case after his wife, the claimant, passed

away, seeks review of the final decision of the Commissioner of Social Security denying

Susan Bush's application for disability benefits under Titles II and XVI of the Social

Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to cite a medical

basis for his opinion and instead relying on an improper credibility analysis and the fact

that the Appeals Council had affirmed plaintiff's prior unfavorable decision only four

months before the hearing in this case. I find that the substantial evidence in the record

as a whole supports the ALJ's finding that plaintiff was not disabled. Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.    BACKGROUND

On May 6, 2009, plaintiff Susan Bush applied for disability benefits under Title II

and on November 27, 2009, she applied for supplemental security income under Title

XVI alleging that she had been disabled since November 1, 2005. Plaintiff's disability

stems from degenerative disc disease in her lumbar spine, hypertension, hypo-

thyroidism, and depression.  Plaintiff's application was denied on February 5, 2010.  On

January 28, 2011, a hearing was held before an Administrative Law Judge. Carl Patrick

Bush had been substituted as plaintiff due to the death of Susan Bush on January 10,

2010.  In this order, the term "plaintiff" refers to Susan Bush unless otherwise indicated.

On February 9, 2011, the ALJ found that plaintiff was not under a "disability" as defined

in the Act.  On June 15, 2012, the Appeals Council denied plaintiff's request for review.

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a

"final decision" of the Commissioner.  The standard for judicial review by the federal

district court is whether the decision of the Commissioner was supported by substantial

evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

determination of whether the Commissioner's decision is supported by substantial

evidence requires review of the entire record, considering the evidence in support of

and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The

Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450

U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These

regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential

evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and

is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff's husband Carl Bush and

vocational expert Clarence Hulett, in addition to documentary evidence admitted at the

hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1977 through 2010, shown in actual and indexed figures:

| Year | Actual | Indexed |
|------|--------|---------|
| 1977 | $ 390.85 | $ 1,652.01 |
| 1978 | 4,302.02 | 16,845.71 |
| 1979 | 6,800.51 | 24,487.12 |
| 1980 | 9,838.88 | 32,500.19 |
| 1981 | 4,247.18 | 12,746.37 |
| 1982 | 9,048.13 | 25,737.76 |
| 1983 | 9,987.96 | 27,091.38 |
| 1984 | 10,069.72 | 25,796.70 |
| 1985 | 10,828.13 | 26,606.04 |
| 1986 | 11,470.71 | 27,372.50 |
| 1987 | 12,654.63 | 28,387.29 |
| 1988 | 16,875.98 | 36,079.79 |
| 1989 | 16,954.92 | 34,866.15 |
| 1990 | 13,855.89 | 27,236.70 |
| 1991 | 11,028.76 | 20,900.51 |
| 1992 | 3,583.13 | 6,457.64 |
| 1993 | 7,036.08 | 12,572.53 |
| 1994 | 10,872.22 | 18,919.41 |
| 1995 | 12,668.00 | 21,194.80 |
| 1996 | 16,421.00 | 26,192.95 |
| 1997 | 14,815.02 | 22,328.39 |
| 1998 | 14,410.41 | 20,638.40 |
| 1999 | 11,415.17 | 15,485.66 |
| 2000 | 16,929.34 | 21,762.64 |

| 2001 | 16,525.10 | 20,748.02 |
| 2002 | 20,194.32 | 25,103.13 |
| 2003 | 17,220.91 | 20,896.14 |
| 2004 | 18,534.99 | 21,491.57 |
| 2005 | 19,352.45 | 21,647.34 |
| 2006 | 4,457.85 | 4,767.36 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |
| 2009 | 0.00 | 0.00 |
| 2010 | 0.00 | 0.00 |

(Tr. at 146-147).

**Death Certificate**

Plaintiff died on January 20, 2010 (Tr. at 142).

**Disability Report - Field Office**

In a Disability Report completed on November 25, 2009 (approximately two months before plaintiff's death), L. Hopkins of Disability Determinations met with plaintiff face to face (Tr. at 149-153). The interviewer observed that plaintiff was polite and cooperative and able to answer questions effectively. "She did tear up several times during the interview. She used a cane, and her gait was very slow. She had trouble getting up out of her chair, and she also had to shift her weight while sitting during the interview. She appeared to be very uncomfortable, in pain, and despondent." The interviewer noted that plaintiff had no difficulty concentrating, understanding, answering, or coherency. The form indicates that plaintiff had previously filed applications for disability and had been denied most recently on July 31, 2009.

**Disability Report**

In an undated Disability Report, plaintiff stated that she had degenerative arthritis of the lumbar spine, disc disease, depression, and high blood sugar. "I have fallen several times (7/1/09, 8/6/09, 8/9/09, and 8/26/09)." Plaintiff said she could sit for 10 to 15 minutes at a time and stand for 15 to 20 minutes at a time and after that she would get dizzy. She could lift no more than 5 pounds. "It's only 14 steps from the couch to the bathroom, and often I don't even make it that far w/o an accident. I use a cane on a daily basis."

**Function Report**

In a Function Report dated December 6, 2009, plaintiff reported that her daily activities include the following: She gets up at 8:30 a.m., uses the restroom, takes her medication, lies down until 12:30 when she takes more medication and drinks a glass of water. At 3:00 p.m. she gets a cup of coffee and goes back to the couch, props up pillows and lies against them. At 5:00 p.m. she uses the restroom. At 7:00 p.m. she gets something to eat. At 9:00 p.m. she uses the restroom and then goes to sleep for the night (Tr. at 174-181). She constantly wakes up during the night. She has problems putting on her pants, socks and shoes. She is unable to get in and out of the bath tub due to falling. Her arms go numb and she has difficulty bending them when she tries to care for her hair. She is able to feed herself. She has to use a grab bar to use the toilet. She does not need reminders to take care of personal needs and grooming or to take her medication. She prepares her own meals, "very quick like frozen dinners." She does no housework or yard work. She has unbearable pain in her

shoulders, she get dizzy and sees stars when she stands for too long, she feels faint, she is afraid of falls, she has pain in her lower back and legs, she has a loose feeling in her hands and arms. When she goes out, she rides in a car. She does not go out alone because she is afraid. She does not drive due to pain. Her husband does all the shopping. She watches television for about six hours per day but sometimes her vision gets blurry or she sees double. She has no problems getting along with others, but she does not go anywhere. Her condition affects her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, and use her hands. She does not have difficulty with reaching, talking, hearing, understanding or following instructions. Walking the 14 steps to her bathroom causes her to sweat. She does not finish what she starts, she does not handle changes in routine well, and she does not handle stress as well as she used to. She uses a cane but it was not prescribed by a doctor.

**Function Report - Third Party**

Plaintiff's husband completed a Function Report - Third Party on December 20, 2009 (Tr. at 204-206). He reported that plaintiff's condition does not affect her ability to use her hands, follow instructions, understand, reach, see, remember or concentrate. He noted that she cries a lot and sleeps a lot. He reported that she uses a cane and crutches when her pain is bad.

**Previous Denial**

On August 4, 2009, Administrative Law Judge Craig Ellis entered an order finding plaintiff not disabled (Tr. at 56-64). This was the result of a prior application for

8

disability filed by plaintiff on June 25, 2007, in which she alleged that she became disabled on June 14, 2006, due to back pain, high cholesterol and hypertension. Plaintiff had testified at a hearing on February 19, 2009, and submitted medical records from Sharon Carmignani, M.D., plaintiff's treating physician. Judge Ellis found that plaintiff suffered from degenerative disease of the lumbar spine, which was a severe impairment. Plaintiff testified that she saw Dr. Carmignani for an examination in order to get Medicaid, which she did, and then saw the doctor three more times after that. She was sent to an occupational medicine specialist for a post-hearing exam on March 26, 2009, and was observed to have no difficulty dressing and undressing without assistance, getting on and off the exam table without assistance, or sitting for the duration of the history and a portion of the physical exam without signs of pain including no shifting her position while sitting. She rated her pain an 8 out of 10 on that day, but the doctor observed plaintiff to be in no distress. Her strength was normal, and the doctor observed that plaintiff could sit, stand, walk, lift, carry, handle objects, and travel without difficulty. The diagnosis included "chronic low back pain and subjective greater than objective findings." The ALJ remarked that there were "a number [of] inconsistencies noted during the examination which seemed to indicate that the claimant was exaggerating her pain." Plaintiff made no allegation of disabling mental symptoms in this prior case which was denied very shortly before she filed the instant application for disability benefits.

**B.  SUMMARY OF MEDICAL RECORDS**

The records prior to August 4, 2009, were submitted in plaintiff's previous disability case.

On January 19, 2009, plaintiff saw Sharon Carmignani, M.D., for hypertension, hyperlipidemia, and pain in her back and hip (Tr. at 231-233).  Her blood pressure at an outside facility was up so she came in for treatment.  "Low back pain is chronic, she has had x-rays which have shown mild DJD. . . .  Pain in right hip is chronic, x-ray by Dr. Cravens was by his records unremarkable.  Pt states pain is worse with walking, both hip and back bother [her]."  As far as hyperlipidemia, "Reasons for screening include tobacco use.  Additional information:  Severely hyperlipidemic, did not return for treatment although asked to do so."  On exam plaintiff's extremities were normal.  She was in no distress.  There was no mention of any examination of her back; no psychological symptoms were observed.

On June 1, 2009, plaintiff saw Dr. Carmignani for a follow up on her high blood pressure, high cholesterol, and back pain (Tr. at 230).  "She is not taking any of her medications at this point.  She states that her Medicaid was cancelled. . . . She does continue to smoke.  She smokes a pack of cigarettes a day. . . .  She states that her back pain prohibits her from working; however, x-rays show very mild degenerative arthritis."  Review of symptoms was otherwise negative.  Plaintiff did not report any psychological symptoms.  She was observed to be in no distress.  "With encouragement she can move around the room without difficulty. . . .  Gait and station

were normal." Dr. Carmignani prescribed Lisinopril for hypertension and noted that it should be affordable to plaintiff.

On July 1, 2009, plaintiff had a well-woman exam with Dr. Carmignani (Tr. at 226-229). Her chronic problems consisted of unspecified essential hypertension, other and unspecified hyperlipidemia, unspecified backache. Plaintiff reported smoking a half a pack of cigarettes per day for the past 28 years. The record states, "Negative for psychiatric symptoms."

August 5, 2009, is the first day of the relevant period in this case, as it is the day after the ALJ denied plaintiff's previous application for disability benefits.

On September 28, 2009, plaintiff saw Dr. Carmignani (Tr. at 225). Plaintiff reported that she had been dizzy and nauseated for the last three months. She said she fell three times in August and believes this is due to being weak, not dizzy. Plaintiff was on no medications. She had not started the cholesterol medication that she received in July. "She states that after she fell she hurt her knee. She has difficulty putting weigh on it. She states that that is her good leg. She also complains of hurting all over. She states she lies in bed all of the time. She does walk with a cane today and limps favoring her left leg. She did not go and have this x-rayed. She has not attempted any exercises of her legs. She was seen in July. She had a well woman exam at that time. Previous to that she was seen in June and at that time I attempted to treat her for her hyperlipidemia. She still no longer has her Medicaid. She has chronic back pain. She is not on any blood pressure medications". Plaintiff was able to get on and off the exam table albeit slowly. She "has resistance to range of motion when I try to

straighten the knee. There may be a slight amount of swelling." Dr. Carmignani wrote, "If she truly is lying in bed all of the time she is getting weaker and that will contribute to this. I have advised that she needs an x-ray of the left knee. We cannot be sure that it is not broken. She hesitates and states that she does not really believe that it is necessary, but she does take the paper. She is handing me papers for disability rating at this time." Plaintiff was told to get an x-ray of her knee and to "do more walking" after she got the x-ray.

That same day plaintiff had x-rays of her left knee due to complains of left knee pain and swelling from a fall (Tr. at 220, 234). Christopher Bauman, M.D., the interpreting radiologist, noted early degenerative changes and "a moderate knee joint effusion."[1] Plaintiff also had lab work done which showed, among other things, that her liver enzymes were normal (Tr. at 235).

On October 12, 2009, plaintiff saw Dr. Carmignani for a follow up (Tr. at 224). Plaintiff"s blood work showed severe hypothyroidism. "She has not started her thyroid medication yet that I called in for her." Plaintiff said her left knee was somewhat better, the swelling was going down, but she was still having pain. Plaintiff also complained of low back pain and right hip pain. "She looks better today, brighter with good eye contact." Plaintiff had bilateral sacroiliac pain with palpation and right greater trochanteric bursitis pain with palpation. "She favors her left leg when walking at this time and moves slowly because of her back." Dr. Carmignani wrote, "I really have an

---

[1]Effusion in the knee joint, also known as "water on the knee" is a general term for excess fluid accumulation in or around the knee joint.

inadequate database here. She has had x-rays in the past that have had mild degenerative changes only; however, the ones that I see in her chart date from 2003. She has no insurance and so we cannot obtain them at this time." Plaintiff's hypertension was noted as inadequately controlled. Dr. Carmignani gave plaintiff a steroid injection in her right trochanteric bursa. "I would like to get her back on Medicaid at this time so that we can get some kind of workup and perhaps improve her physical condition enough so that she can go back to work."

On November 16, 2009, plaintiff saw Dr. Carmignani for a follow up on back pain, hypothyroidism, "and with complaints of depression." Plaintiff indicated that she had had trouble with depression previously, had been on antidepressants which had helped, and had been "in Arthur Center[2] at least one time." Plaintiff had not taken anything for depression for "a long time". She was feeling down and depressed, reported tearful episodes, said she had not slept well for the last two years. "She has only taken her Thyroid for the last week. She states that it was hard for her to get enough courage to take it, but now she is, so it is too early to reassess for control at this time." Plaintiff's hip was improved since her injection. Plaintiff continued to complain of pain in her back and buttocks. She had no radiation of pain into her leg. "She does walk with a cane." Plaintiff said that her pain interfered with bending. Dr. Carmignani noted that plaintiff appeared "slightly depressed." Her blood pressure was 123/85 and plaintiff had not been taking her hypertension medication. On exam plaintiff had no tenderness in her sacroiliac joint, no tenderness in her right trochanteric bursa. Range

[2]A community mental health center located in Mexico, Missouri.

of motion in her back was "decreased secondary to back pain."  Dr. Carmignani prescribed Celexa, an antidepressant.  Plaintiff was told to continue using Tylenol for her back pain.  "She is offered an injection, which she categorically refuses."

On January 11, 2010, plaintiff was seen by Mark Schmitz, M.S., for a psychological examination in connection with her application for Medicaid (Tr. at 243-247).  Plaintiff had previously been on Medicaid but it was discontinued and she reapplied.  Plaintiff was interviewed for 60 minutes.  She arrived 15 minutes early for her appointment and was cooperative.  Plaintiff was subdued and soft-spoken, and "appeared to be very weak and needed assistance rising from her chair."  Plaintiff ambulated slowly and used a cane for assistance.

Plaintiff reported working at the Fulton State Hospital as a psychiatric aide for approximately 13 years.  Shortly after she left that job, she was admitted to the Arthur Center as a result of suicidal behavior. She had been experiencing a lot of stress from her job and her boyfriend, and she became depressed and took some pills. Her 12-year-old daughter saw her do that, so she spit the pills out in the toilet.  She was in the hospital for about a week "until her boyfriend came to get her and she subsequently left against medical advice."  Her boyfriend dumped her out on a gravel road, so she went back to the Arthur Center for two more weeks.  She was prescribed two different antidepressants but never filled the prescriptions.

Plaintiff stated that about three months before this appointment with Mr. Schmitz, she had been prescribed Celexa but she said it had not been having much effect on her depression.  "[H]er primary physical concern is degenerative disc disease in her back.

14

She reported that she has lost strength in her arms and legs, and she experiences frequent numbness in her legs.  She indicated that she has often fallen as a result of this, and then needs assistance to get back up.  She stated that she even needs help getting up off the toilet.  It was noted that at the end of the interview Ms. Bush struggled considerably rising from her chair."

Plaintiff had a problem with alcohol use about 12 to 14 years earlier and was arrested for driving after having consumed alcohol.  She was fined for a bad check charge at some point in her past.

Plaintiff appeared to Mr. Schmitz to be extremely tired and/or weak.  Her responses to questions were logical and goal directed, eye contact was somewhat minimal.  She was well oriented.  Her other tests were normal, although she was slow in responding.  Plaintiff reported that she had not eaten in the last seven days.  She described other psychological symptoms and reported that her antidepressant was not helping but was making her more irritable and fatigued.  Mr. Schmitz found that plaintiff had a "mental disability which effectively prevents her from engaging in employment or gainful activity for which she would otherwise be qualified.  Her depression is such that she would be unable to function effectively in a work-like setting.  Further, it is this examiner's opinion that Ms. Bush's mental disability is likely to endure for at least the next 13 months or more."  He assessed major depressive disorder and a current GAF of 40.[3]

---

[3]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment,

On January 18, 2010, plaintiff saw Dr. Carmignani (Tr. at 269). "Susan comes in today not doing well for the past month and a half. She states that her legs are weak, that she cannot hold herself up. She is crawling on the floor to get around. Husband had to pick her up twice this week off of the floor. She cannot eat. She cannot keep anything down. She throws up if she tries to eat anything. She stopped her medication 2 weeks ago, which was her thyroid. She is significantly hypothyroid. She also stopped the Celexa which I had prescribed about a month and a half ago. She has not been better since she stopped the Celexa. She is complaining of abdominal pain and she points to the epigastrium where that pain is. She also has had a cough for the last month and a half. She is not producing any phlegm. She is a smoker. She states that she is having a hard time swallowing and that her mouth is dry. She has not been drinking a lot of fluids." Plaintiff was very weak appearing and lethargic. Her blood pressure was 129/88. "Weight is unobtainable as she cannot stand on the scales." Her lungs and heart were normal on exam. Epigastrium[4] was markedly tender to palpation

---

thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[4]



and she had tenderness to the right lower quadrant of the abdomen.  She was

assessed with "Nausea, vomiting, cough, dysphagia [a partial or complete impairment

of the ability to communicate resulting from brain injury], possible weight loss, and

possible dehydration, although her pulse does not reflect that."  She was also assessed

with hypothyroidism, not treated; depression, multiple arthralgias [joint pain], back pain,

and smoking.  Dr. Carmignani told plaintiff's husband to take her to the emergency

room, and she spoke with the emergency room attending physician about plaintiff's

condition.

Plaintiff was admitted to the hospital through the emergency room (Tr. at 270-

325).  Plaintiff reported that she was normal three to four years ago but then her back

started getting worse and "affected her daily activities and she is on disability."  For the

past six weeks she was not able to pull herself up and she attributed that to both the

weakness and the imbalance she had in her legs.  Plaintiff reported having fallen three

times in the last six weeks.  Plaintiff reported a recent inability to eat or drink because of

a gagging sensation.  Plaintiff rated her back pain an 8 to 9 out of 10, although it was

noted that she was not on any pain medication and was "comfortable at present" so  no

pain medication was offered due to her having suspected gastritis.[5]  She reported

having vomited a brown colored fluid which was "acidic" over the past two weeks.  She

said she has panic attacks and palpitations during heightened anxiety.  She was

_____

[5]"Gastritis describes a group of conditions with one thing in common: inflammation of
the lining of the stomach. The inflammation of gastritis is often the result of infection
with the same bacterium that causes most stomach ulcers. However, other factors --
such as injury, regular use of certain pain relievers or drinking too much alcohol -- also
can contribute to gastritis." http://www.mayoclinic.com/health/gastritis/DS00488

observed to be in no acute distress.

Plaintiff reported smoking 1 1/2 packs of cigarettes a day for almost 30 years and her fingers were observed to be nicotine-stained. "Alcoholic, and trying to cut down on it." Plaintiff reported that she had been able to abstain from alcohol for almost two months. On admission to the hospital, it was stated that she had possible gastritis secondary to alcoholism.

An exam of her back revealed no abnormalities in her cervical, thoracic or lumbar spine. Her psychiatric exam was normal. An EKG was normal. X-rays of her heart and lungs were normal. A CT of her abdomen showed possible hepatitis and pancreatitis. A CT scan of her head was normal. A CT scan of her spine was done and showed only mild lumbar spine degenerative changes. X-rays of the spine revealed only mild L4-5 intervertebral disc space narrowing, essentially unchanged. Her lumbar discs and vertebral bodies were well maintained. She had mild lumbar facet hypertrophy and minimal to mild lumbar anterior osteophytosis essentially unchanged. Her liver enzymes were markedly elevated. Treatment was started but plaintiff did not improve significantly. A cardiology consult was called and a 2D echo was done which showed severely depressed left and right ventricular function. She was transferred to the cardiac care unit.

While plaintiff was being evaluated for possible hypothyroidism-induced cardiomyopathy,[6] which is rare, plaintiff's heart rate dropped and she died on January

---

[6]Cardiomyopathy is a disease that weakens and enlarges your heart muscle. There are three main types of cardiomyopathy -- dilated, hypertrophic and restrictive. Cardiomyopathy makes it harder for your heart to pump blood and deliver it to the rest

20, 2010. The Final Report includes the following:

> [T]he patient is a 48 year old white female with HTN [hypertension], hypo-thyroidism, long smoking and alcohol history admitted 1/18 with abdominal pain, back pain, and diffuse weakness. She has not been compliant with HTN meds or levothyroxine. She was noticed to have an altered mental status for which CT scan was done - unremarkable and elevated liver function tests and TSH [thyroid stimulating hormone] . . . . U/S [ultrasound] showed that she has enlarged liver and also multiple hypoechoic areas [abnormal areas which can be seen on an ultrasound] on the liver. . . . Patient was seen by me in the CICU [cardiac intensive care unit] and she was alert, oriented and the Vitals were stable with SBP 120/80 and she was just complaining of generalized weakness.

Plaintiff's blood pressure dropped to 60/40 but she was still fully oriented. The blood pressure cuff was moved to her leg and she started getting agitated. An anesthesiologist and the cardiologist were called in due to the anticipation that plaintiff would need to be intubated.[7] Plaintiff's heart rate dropped, she was intubated, "code blue" resuscitative efforts were maintained for 18 minutes after which time she was pronounced dead. The cause of death was determined to be severe acidosis from the liver failure which compromised her cardiac function.

On February 4, 2010, Deborah Doxsee, Ph.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment was not severe (Tr. at 248-258). She found that plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and had no repeated episodes of decompensation. In support of her findings, Dr. Doxsee noted that plaintiff did not have any unusual anxiety or evidence of

---

of your body. Cardiomyopathy can lead to heart failure.

[7]Endotracheal intubation is a medical procedure in which a tube is placed into the windpipe (trachea), through the mouth or the nose.

depression on July 1, 2009. On exam in November 2009, plaintiff was started on

Celexa and reported trouble with depression previously even though there was nothing

in her medical records about depression. When she reported depression, her treating

physician noted that she only appeared slightly depressed. The record reflects an

observation by an interviewer that plaintiff teared up at times and appeared

despondent. Dr. Doxsee found that the record supported the presence of a medically-

determinable mental impairment but that it was not severe.

On August 5, 2010, Dr. Carmignani wrote a letter to whom it may concern (Tr. at

267).

> I was asked to fill out an evaluation for her in regards to her ability to work in
> March 2009. Her reason for not working at that time had been chronic back
> pain. X-rays at that time revealed minimal degenerative arthritis of the back and
> in filling out the evaluation in terms of what her abilities were, I filled out the form
> such that she would be able to function in a sedentary job. Since then, however,
> it became clearer that Susan was very dysfunctional in terms of her ability to
> respond normally to medical treatment as well as her emotional state. She was
> found to be profoundly hypothyroid and was started on thyroid replacement;
> however, she did not take this medication. She also was profoundly depressed.
> She became weaker and weaker and unable to basically participate in her care
> or to participate in the activities of daily living. She did see Dr. Mark Schmitz [I
> note that Mr. Schmitz is not a doctor] in January of 2010 who diagnosed her with
> major depression, a diagnosis with which I agree completely. I had previously
> attempted to start her on antidepressants. Again, she was totally unable to
> participate in her medical care and did not take the antidepressants or the
> thyroid medication. I see this not as manipulation but rather as a sign of her
> severe depression. She ultimately presented with severe weakness, nausea,
> vomiting and was admitted from the clinic to the hospital for these symptoms.
> She did have a cardiopulmonary arrest 2 days after her admission to the
> hospital. She had liver failure, severe hypothyroidism, hypotension and
> cardiomyopathy at the time of her death. The etiology of her liver failure is not
> clear to me at this time . . . . She was certainly unable to work during that period
> of time from summer of 2009 on into the time that she presented to the hospital
> and given her mental problems, I believe that she was not able to work before
> that as well. I think that most of her incapacity relates to her severe depression.

When I filled out the Social Security form, I was only asked to answer questions in regard to her lumbar spine and believe that although she was capable of sedentary work from an orthopaedic standpoint, that her mental illness in the form of severe affective disorder prohibited her ability to pursue gainful employment.

## C. **SUMMARY OF TESTIMONY**

During the January 28, 2011, hearing, plaintiff's husband, Carl Bush, testified; and Clarence Hulett, a vocational expert, testified at the request of the ALJ.

## 1. **Testimony of Carl Bush.**

Carl Bush and plaintiff were married in September or October of 1985 (Tr. at 32). Plaintiff had two children from a previous relationship (Tr. at 32). For the past six months, Mr. Bush has had two roommates who used to be his neighbors but now pay him rent to live in his home (Tr. at 33). He could not remember his address (Tr. at 31-32).

Plaintiff had a 10th grade education and did not get a GED (Tr. at 48). Her biggest medical problem was her pain (Tr. at 33). She had a lot of pain, she could not walk very well without assistance, she needed help getting up and down, and she cried a lot (Tr. at 33). She had pain in her lower back that caused numbness in her legs and arms (Tr. at 33). This was not caused by any accident; it started three or four years before the hearing but during the past year it progressed to the point where she could not walk (Tr. at 33-34). Her doctor said she had arthritis (Tr. at 34).

Plaintiff was also being treated for high blood pressure and depression (Tr. at 34). When asked if she was taking her hypertension medication regularly, Mr. Bush said, "I thought she was on it regularly." (Tr. at 34). Plaintiff had just been diagnosed

with severe depression in December 2009 (the month before her death) and was started on medication (Tr. at 34). Her depression was caused by her inability to walk, do dishes, do laundry and go grocery shopping (Tr. at 34, 35). The arthritis caused numbness in her legs and she could not feel the ground she was walking on so she tripped a lot (Tr. at 35). Mr. Bush refilled plaintiff's medications, so he believes that plaintiff was taking all of her medications regularly (Tr. at 35). Mr. Bush did not actually see plaintiff take her medication:

> Q. Did anybody actually see her take it?

> A. No, sir. I worked in -- I've seen -- I've seen her -- she had a hard time taking just aspirin or pills. She had to stick in down her throat and choke it down, and I seen her do it myself.

Plaintiff did not see a psychiatrist -- her general practitioner prescribed depression medication (Tr. at 36). When Mr. Bush was first dating plaintiff -- sometime before 1985 -- she was in a place in Mexico, Missouri, for depression and stayed there for 90 days (Tr. at 36-37). Plaintiff was not treated for any depression issues since she got married in 1985 (Tr. at 37-38). Mr. Bush was asked how long they had been married, and he said, "Eighteen years last year." (Tr. at 38). However, this was in January 2011; and if they were married in September or October 1985, they would have been married approximately 25 years "last year."

Up until the last five years, plaintiff got along with everybody (Tr. at 38). But after she could no longer work, she fell apart and did not talk to anyone and would not leave the house (Tr. at 38). Plaintiff previously worked as a plumber (Tr. at 38). She also

worked as a nurse's aide and she worked at a Dollar General store as a stocker (Tr. at 38). She did that for six years and quit that job in 1995 (Tr. at 38). Mr. Bush testified that the stocker job was her last job (Tr. at 39).

Q.    Well, it said she did plumbing after that.

A.    No, sir, she.  No, she didn't do any plumbing -- she hasn't done any plumbing in 10 years, 12 years.

Q.    Well, that'd put it at '99.  You said '95.

A.    Well, I'm having a hard time with this.

Q.    All right, well, it said she worked as a stocker from 2000 to 2006.  Does that make any sense?

A.    No. Dollar General was her last job, and it was -- she filed this case after she got diagnosed with arthritis, and she worked two years after she was diagnosed, and then she just couldn't do it anymore 'cause of the pain.

Q.    Well, I mean, she's got a decent earnings record all the way up through 2006.

A.    Yes, sir.

Q.    She was working up through 2006, sir.

A.    Well, that's what I'm saying, you know, I -- I'm not real --

Q.    You just don't remember, okay.

A.    Right.

(Tr. at 39-40).

Once plaintiff became depressed, she would not leave the house or even talk to her kids on the phone (Tr. at 46). Three years before the hearing, it got to the point where she would not go anywhere, and before that she went everywhere with Mr. Bush (Tr. at 46). She was in too much pain and did not want to go anywhere (Tr. at 46). Mr. Bush had to hep plaintiff in and out of the tub and help her put on her shoes (Tr. at 46). She could not stand to take a shower, and she could not walk because she could not feel her legs (Tr. at 46). She would not take a bath unless Mr. Bush was there because she was afraid she would drown (Tr. at 46-47). She fell and could not get up in August 2009, and that is when she started using a cane (Tr. at 47). Mr. Bush put grab bars up around their home to help her (Tr. at 47).

Plaintiff had just started taking thyroid medication in December 2009 (Tr. at 42). Mr. Bush is not aware of any other conditions for which plaintiff was being treated (Tr. at 41).

Plaintiff was a smoker (Tr. at 42). She smoked about a half a pack of cigarettes per day (Tr. at 42). Plaintiff would drink a six-pack of beer on the weekends, but she did not drink hard liquor and did not use illegal drugs (Tr. at 43). Mr. Bush got a job remodeling his landlord's rental properties in town so that he could check on plaintiff (Tr. at 43). She fell one time and was on the floor for two or three hours until he got home so he got that job so he could stay close (Tr. at 43). Plaintiff was at home by herself during the day though (Tr. at 43). When he was working down the street, Mr. Bush would go home to check on her three or four times a day (Tr. at 43-44). Plaintiff would either be sleeping or sitting on the couch (Tr. at 44). Plaintiff did not watch

television during the day, she just sat on the couch and would not get up unless Mr. Bush helped her up (Tr. at 44). Mr. Bush did all the laundry, did the dishes, and did the cleaning (Tr. at 44). In the last five years, plaintiff would not even leave the house except to go to a doctor (Tr. at 44-45). Plaintiff was on Medicaid and their landlord took plaintiff to her doctor appointments (Tr. at 45).

Plaintiff's cause of death was that her liver caused her heart to fail (Tr. at 45).

2.     **Vocational expert testimony.**

Vocational expert Clarence Hulett testified at the request of the Administrative Law Judge. The first hypothetical involved a person would could lift 20 pounds occasionally and 10 pounds frequently, would need to alternate sitting and standing at will, could walk for two hours per day; who would have an unlimited ability to push and pull with her arms and had no trouble with gross and fine manipulation; who could only occasionally push and pull with her lower extremities; who could occasionally climb stairs; who could never climb ladders, ropes or scaffolds; who could never run; who could occasionally bend, stoop, crouch, crawl, balance, twist or squat; who would need limited exposure to heights, dangerous machinery, uneven surfaces and excessive vibration; who could understand at least simple instructions, concentrate, perform simple tasks, and respond and adapt to workplace changes and supervision but would need limited public contact (Tr. at 48-49). Such a person could not perform any of plaintiff's past relevant work (Tr. at 49). The person could perform light unskilled jobs such as electronics worker, DOT 726.687-010, with 210,000 such jobs in the nation and 200 locally; a small products assembler, DOT 739.687-030, with 205,000 such jobs in

the nation and 250 locally; or ticket seller, DOT 211.467-030, with 185,000 jobs in the nation and 150 locally (Tr. at 50).

The second hypothetical was the same as the first except the person would need to be standing for a total of two hours per day while exercising the sit/stand option, and while standing the person would need to use a cane (Tr. at 50-51). The vocational expert testified that those three jobs could be performed with a sit/stand option, but the use of a cane "could affect the competitive nature of the job" (Tr. at 51).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Gary Suttles entered his opinion on February 9, 2011 (Tr. at 15-24). Plaintiff's last insured date was December 31, 2011 (Tr. at 15, 17).

Step one. Plaintiff did not engage in substantial gainful activity after November 1, 2005, her alleged onset date (Tr. at 17). Plaintiff worked after her alleged onset date but her earnings did not rise to the level of substantial gainful activity (Tr. at 17).

Step two. Plaintiff suffered from the following severe impairments: lumbar degenerative disc disease, hypertension, hypothyroidism, and major depressive disorder (Tr. at 17). The ALJ noted that plaintiff had only "very mild" to "mild" degenerative disc disease, she had "mild" hypertension with no associated symptoms, she was non-compliant with her thyroid medication, and she was non-compliant with her antidepressant medication (Tr. at 17-18).

Step three. Plaintiff's severe impairments did not meet or equal a listed impairment (Tr. at 18-20).

Step four.  Plaintiff retained the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; walk for 2 hours per day; alternate sitting and standing at will; had an unlimited ability to push, pull, and perform tasks requiring gross and fine manipulation except that she could only occasionally push with her lower extremities; she could never run or climb ladders, ropes, or scaffolds; she could have only limited exposure to heights, dangerous machinery, uneven surfaces, and excessive vibration; she could get along with others, understand simple instructions, concentrate, perform simple tasks, respond and adapt to workplace changes and supervision, but should have limited contact with the public (Tr. at 20).  The ALJ found that plaintiff's husband's testimony about her limitations was not credible as it was contradicted by her daily activities, her non-compliance with treatment, her lack of medical treatment, her use of only over-the-counter pain medications and refusal to try an epidural steroid injection.  With this residual functional capacity, plaintiff was unable to perform her past relevant work (Tr. at 22).

Step five.  Plaintiff was capable of working as an electronics worker, a small products assembler, or a ticker seller, all available in significant numbers (Tr. at 25).  Therefore, plaintiff was not disabled at any time from her alleged onset date until the date of her death (Tr. at 24).

## VI.      RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity because her depression essentially crippled her causing her to be so weak that she could not do anything physically and eventually leading to her heart failure due

to an inability to care for herself.  Plaintiff specifically challenges the ALJ's failure to rely

on any one medical opinion.  Plaintiff mistakenly refers to Mark Schmitz as a doctor --

he is not a doctor.

The opinions dealing with plaintiff's mental health are (1) the opinion of Mark

Schmitz who is not a doctor but rather has a masters degree, (2) the opinion of Dr.

Doxsee who did not examine plaintiff, and (3) the opinion of plaintiff's treating physician,

Dr. Carmignani, which was rendered seven months after plaintiff died.  In assessing

plaintiff's mental residual functional capacity, the ALJ explained his reasoning as

follows:

> Additionally, the claimant had a history of depression.  In July 2009, the claimant
> was alert and oriented with no psychiatric symptoms and no evidence of
> depression.  In contrast, she complained of depression with sleep disturbance in
> November 2009.  After noting that she appeared "slightly" depressed, her
> primary care physician prescribed Celexa.  However, she was subsequently non-
> compliant with her medication.  Accordingly, by January 2010, she endorsed
> additional depressive symptoms of anhedonia and appetite disturbance.  She
> was then diagnosed with MDD and assigned a global assessment of functioning
> (GAF) score of 40.  A GAF score of 40 indicates "some impairment in reality
> testing or communication" or "major impairment in several areas, such as work or
> school, family relations, judgment, thinking, or mood" (American Psychiatric
> Ass'n, Diagnostic and Statistical Manual or Mental Disorders (4th ed. 1994)).  In
> weighing the score, the undersigned notes that, unless specifically indicated for
> the past year, a GAF score is for the current level of functioning and such scores
> can result in major variations.  See Diagnostic and Statistical Manual of Mental
> Disorders, at p. 33 (4th ed. Text Revision 2000).  Finally, the undersigned notes
> that the GAF scale has no direct correlation to the severity requirements in the
> mental disorder listings. See 65 Fed. Reg. 50746, 50764-65 (August 21, 2000).
>
> * * * * *
>
> Through the date of death, the claimant's mental impairment did not meet or
> medically equal the criteria of listing 12.04.  In making this finding, the
> undersigned has considered whether the "paragraph B" criteria were satisfied.
> To satisfy the "'paragraph B" criteria, the mental impairment must result in at

28

least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant had mild restriction. The claimant's surviving spouse testified that she did not perform any chores, and spent most of her time sleeping or sitting on the couch (hearing record). He also testified that he checked on the claimant three to four times during his workday. However, the claimant and her surviving spouse completed function reports approximately one month prior to her death, wherein they admitted that she could perform some activities of daily living.

In social functioning, the claimant had moderate difficulties. As testified by the claimant's surviving spouse, she did not talk to anyone and left the house only to go to the doctor. In contrast, just prior to her death, the claimant reported that she had no problems getting along with family, friends, neighbors, or authority figures.

With regard to concentration, persistence or pace, the claimant had moderate difficulties. Though the claimant reported that she had difficulty with memory, completing tasks, and concentrating, she admitted that she was "ok" at understanding and following written and spoken instructions.

As for episodes of decompensation, the claimant experienced no episodes of decompensation of extended duration. Indeed, there is no medical evidence of record confirming any episodes of decompensation of extended duration from the alleged onset date through the date of death.

Because the claimant's mental impairment did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied.

The undersigned has also considered whether the "paragraph C" criteria were satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. As noted above, the claimant did not experience any episodes of decompensation of extended duration from the alleged onset date through the date of death. Also, the evidence does not indicate that a "minimal increase in mental demands" or a "change in the environment" would have

caused her to decompensate. In addition, there is no indication that, through the date of death, the claimant was unable to function outside of a highly supportive living arrangement.

* * * * *

Also remarkable, this case was previously denied by Administrative Law Judge Craig Ellis on August 4, 2009, and affirmed by the Appeals Council on September 17, 2010, only four months prior to the hearing. The undersigned notes that no new or material evidence was submitted that would change the prior decision and prompt re-opening, or support the award of benefits on the current application.

* * * * *

Turning to the mental opinion evidence, the undersigned has considered the opinion of Mark Schmitz, a licensed psychologist. After interviewing the claimant in January 2010, he opined as follows: "Ms. Bush has a mental disability which effectively prevents her from engaging in employment or gainful activity for which she would otherwise be qualified. Her depression is such that she would be unable to function effectively in a work-like setting. [Her] mental disability is likely to endure for at least the next 13 months or more." The undersigned affords little weight to this opinion because it is inconsistent with the other objective medical evidence of record. Likewise, per 404.1527(e) and 416.927(e), the issue of whether a claimant is unable to work is reserved to the Commissioner.

The undersigned has also considered the opinion of Deborah Doxsee, Ph.D., a State agency psychological consultant. In February 2010, Dr. Doxsee opined that the claimant's depression was a non-severe impairment. The undersigned affords little weight to Dr. Doxsee's opinion because, as shown above in finding number three, there was sufficient evidence to classify the claimant's depression as severe.

In addition, the undersigned has considered the opinion of Sharon Carmignani, M.D., the claimant's treating physician. In August 2010, Dr. Carmignani opined as follows: "She was certainly unable to work . . . from summer of 2009 on into the time that she presented to the hospital and given her mental problems, I believe that she was not able to work before that as well . . . Although she was capable of sedentary work from an orthopedic standpoint, . . . her mental illness . . . prohibited her ability to pursue gainful employment." The undersigned affords little weight to this opinion because it is inconsistent with the other objective medical evidence of record that indicated the claimant did not seek or receive any regular mental health treatment nor was she taking any medication for her

condition. Furthermore, Dr. Carmignani is not a mental health professional nor did she treat the claimant's mental condition. I find her opinion speculative in nature and [it] lacks credibility. Likewise, per 20 CFR 404. 1527(e) and 416.927(c), the issue of whether a claimant is unable to work is reserved to the Commissioner.

In sum, taking into account the record as a whole, including the aforementioned Polaski factors, the undersigned concludes that, through the date of death, the claimant had the capacity to perform light work with the limitations set out in the residual functional capacity above.

(Tr. at 18-22).

## Opinion of Mr. Schmitz

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.  Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.  Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.  Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

Mr. Schmitz is not a doctor; however, he is a licensed psychologist. A licensed psychologist with only a master's degree has been held to be an acceptable medical source for purposes of determining whether a claimant has a severe impairment. Bronson v. Astrue, 530 F. Supp.2d 1172 (D. Kan. 2008).

Mr. Schmitz interviewed plaintiff for 60 minutes in connection with her Medicaid application. He did not treat her. The few tests he performed had essentially normal results except that she was very slow in participating. She appeared to be very weak and soft spoken. His other observations were normal. The only functional ability he

discussed was her ability to "function effectively in a work-like setting."  He did not

indicate the level of her impairment on this one functional ability.  Instead, he provided

his opinion that plaintiff was disabled from all employment for at least 13 months.

A one-time evaluation by a nontreating psychologist is of little significance by

itself.  Loving v. Department of Health and Human Services, 16 F.3d 967 (8th Cir.

1994), citing Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992).  Mr. Schmitz did

not review any of plaintiff's medical records.  He merely assumed that her very slow

participation and her extreme weakness were caused by depression.  Because plaintiff

died a couple weeks later of liver failure, it is possible that her lethargy and weakness

were caused by liver failure and not depression.[8]   Additionally, the first time plaintiff

ever complained of depression was on November 16, 2009 -- less than two months

before Mr. Schmitz found that she was completely disabled due to depression -- and

her treating doctor noted only that plaintiff appeared "slightly depressed" at that time.

The ALJ properly discounted the opinion of Mr. Schmitz because his opinion (1)

is the result of nothing more than plaintiff's allegations, her slow responses on

psychological exams, and his observation of her extreme weakness and lethargy during

_____

[8]The Mayo Clinic publishes the following about acute liver failure:  "Signs and
symptoms of acute liver failure may include: A yellowing of your skin and eyeballs
(jaundice), pain in the upper right area of your abdomen, nausea, vomiting, a general
sense of not feeling well, difficulty concentrating, disorientation or confusion,
sleepiness.  When to see a doctor:  Acute liver failure can develop quickly in an
otherwise healthy person, and it is life-threatening.  If you or someone you know
suddenly develops a yellowing of the eyes or skin, tenderness in the upper abdomen or
any unusual changes in mental state, personality or behavior, seek medical attention
right away."
http://www.mayoclinic.com/health/liver-failure/DS00961/DSECTION=symptoms

a 60-minute interview, (2) it is inconsistent with her treatment records showing no complaints of depression until less than two months earlier when her treating doctor observed only slight depression, (3) plaintiff's symptoms are consistent not only with severe depression, which is unsupported by medical records, but also with acute liver failure, which is supported by the medical records, (4) his opinion did not discuss plaintiff's functional limitations, and (5) his opinion consisted of a conclusory statement that plaintiff cannot work due to depression and that is a judgment that is reserved for the Commissioner.  McDade v. Astrue, 720 F.3d 994, 1000 (8th Cir. 2013); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.").

**Opinion of Dr. Doxsee**

The ALJ also discredited the opinion of non-examining psychologist Dr. Deborah Doxsee because she found that plaintiff's impairment was not severe, and the ALJ found that plaintiff's mental impairment, although not disabling, was severe.  This was based on plaintiff's allegations of problems with memory and her social isolation, not on any treatment records, and therefore the ALJ gave plaintiff the benefit of the doubt in finding that her mental impairment was severe.  Plaintiff does not argue that the ALJ should have relied on the opinion of Dr. Doxsee.

**Opinion of Dr. Carmignani**

Sharon Carmignani, M.D., was plaintiff's treating physician. On August 5, 2010 -- seven and a half months after plaintiff's death -- Dr. Carmignani wrote a letter to whom it may concern finding that plaintiff was "certainly unable to work during the period of time from summer of 2009 on into the time that she presented to the hospital and given her mental problems, I believe that she was not able to work before that as well." Dr. Carmignani stated that plaintiff was not disabled physically, only because of depression.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ gave no weight to Dr. Carmignani's opinion because, "it is inconsistent with the other objective medical evidence of record that indicated the claimant did not

seek or receive any regular mental health treatment nor was she taking any medication for her condition. Furthermore, Dr. Carmignani is not a mental health professional nor did she treat the claimant's mental condition. I find her opinion speculative in nature and [it] lacks credibility. Likewise, per 20 CFR 404.1527(e) and 416.927(c), the issue of whether a claimant is unable to work is reserved to the Commissioner."

Plaintiff saw Dr. Carmignani fairly regularly for at least a year. Dr. Carmignani did not treat plaintiff for any mental health condition other than to prescribe an anti-depressant after having observed that plaintiff was "slightly depressed" and plaintiff complained of feeling depressed. Plaintiff did not take the antidepressant. Dr. Carmignani did not perform any mental tests, and her opinion that plaintiff's depression was of disabling severity is inconsistent with all of plaintiff's treatment records and her hospital records. The ALJ properly discredited this opinion.

Plaintiff also challenges the ALJ's reliance on the fact that in her previous application for disability, plaintiff had no severe mental impairment, and this opinion was rendered just months before her death.

The ALJ in this case expressly stated that he was not reopening plaintiff's prior applications, and the Commissioner's prior decisions are res judicata and not subject to judicial review. Boock v. Shalala, 48 F.3d 348, 351 (8th Cir. 1995); Brown v. Sullivan, 932 F.2d 1243, 1245-1246 (8th Cir. 1991), citing Califano v. Sanders, 430 U.S. 99, 107-109 (1977). Plaintiff has presented no Constitutional claim in this case, and the ALJ's refusal to reopen plaintiff's prior applications is not reviewable. Id. Therefore, the

relevant time period for consideration of plaintiff's claims is from August 5, 2009, through January 20, 2010.

The ALJ was required to base his decision on all of the relevant and credible evidence of record, including the plaintiff's daily activities, lay evidence, and frequency and duration of medical treatment.  SSR 96-8p; 20 C.F.R. §§ 404.1545 and 416.945; Eicheberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Contrary to plaintiff's argument, the ALJ was not required to rely entirely on a particular physician's opinion or choose between any of the opinions in the record.  Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).  In fact the ALJ is not required to base his determination solely on medical reports or sources.  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  The ALJ properly considered plaintiff's medical care (and lack thereof), her treatment, her allegations in her administrative paperwork, her husband's testimony, and all of the medical and lay opinions and observations in the record in determining her residual functional capacity.  The substantial evidence in the record as a whole supports his decision.

## VIII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 13, 2013